Deegan v. Capner.

JANE DEEGAN et al.

*v.*

JOSEPH CAPNER et al.

1. Executors, who were charged with the investment of $400 for A during his minority, and with the investment of $5,000 for the testator's widow for her life, and the distribution of that $5,000 at her death, and with the investment of other moneys for the life of a daughter of the testator, combined all those moneys in a single investment, and ultimately suffered one of their number to convert the entire fund to his own use.—*Held*, that, to a suit for an accounting and distribution, upon the death of the widow, A is a necessary party.

2. To a suit in which the ascertainment and disposition of the residue of an estate is sought, all persons interested in such residue must be made parties.

3. If a trustee, or person standing in a similar capacity, sell a trust estate and himself become the purchaser, the *cestuis que trustent* are entitled, as of right, to have the property resold, or, at their election, to acquiesce in the sale, and hold the trustee responsible for the proceeds ; and this, though the sale to the trustee may have been had at public action, in good faith, and for a fair price.

4. If a trustee use trust funds in the purchase of property for himself, it is a violation of his duty as trustee, and the profits of such purchase or business must enure to the benefit of the *cestuis que trustent*, though any loss must fall exclusively upon the trustee.

Thomas Capner, late of Lawrence township, in Mercer county, died on the 10th of November, 1864, testate. His will bears date on June 14th, 1864, and was admitted to probate on the 29th of November in the same year. It directs that the testator's debts and funeral expenses be paid, and continues in the following language :

" *Item.* I give, devise and bequeath to my wife, Margaret, out of the proceeds of my real and personal estate, in lieu of her right of dower, the interest of the sum of $5,000, which said sum shall be invested by my executors upon bond and mortgage on good real estate, for her benefit, and the interest to be paid to her semi-annually as long as she remains my widow ; and I also give to her all my silver spoons and two feather beds and bedding, and two bedsteads, her own choice.

" *Item.* In order to enable my executors, hereinafter named, to carry out the provisions of this my last will and testament, I do hereby authorize and

empower them to sell and dispose of all my property and estate, both real and personal, at any time after my decease, either at public or private sale, and to execute good and valid deeds of conveyance for the same to any purchaser or purchasers.

"*Item.* After securing to my said wife the said sum of $5,000 in the manner and for the purpose above mentioned, and paying the legacies hereinafter mentioned, and paying my just debts and funeral expenses, and the expenses of settling up my estate, my will is that all the rest and residue of my said estate shall be divided amongst my children, as follows : To Jane Deegan, one share ; to Joseph Capner, one share ; to Elizabeth Hughes, one share ; to Thomas Capner, one share ; to James Capner, one share ; to Mary Ann Howell, one share ; to Margaret Mortimore, one share ; to Hugh Capner, one share. I give to my grandson, Frank Hughes, son of my daughter, Sarah W. Hughes, deceased, the sum of $400, to be placed at interest for his benefit during his minority, and the principal to be paid to him on his arriving at full age.

"*Item.* I give to my two grandchildren, William Henry and Christianna, children of my son, William J. Capner, each the sum of $400, to be placed at interest for their benefit during their minority, and the principal to be paid to them on their arriving at age.

"*Item.* I give to the four children of my daughter, Jane Deegan, who are now living , to wit, Margaret Ann Lord, $100 ; to Mary Elizabeth Lord, $200 ; to Sarah Jane Lord, $100, and to Lavina Lord, $100, which said sum of $500 is to be deducted out of their mother's share, and the balance of the said mother's share to be invested on bond and mortgage, and the interest to be paid to her annually as long as she shall live, and at her decease the principal to be divided equally between her above-named children, or the survivors of them, share and share alike."

The testator's three sons, Joseph, Thomas and James, were appointed executors of the will, and subsequently proved it, and assumed the duties of executorship.

The bulk of the estate consisted of a farm of about one hundred and twenty acres in Lawrence township. Before his death, the testator had contracted to sell that farm to his son Thomas for $18,000, and Thomas had paid him $1,000 on account of the purchase price. After the testator's death, the executors thought it best to conclude the sale to Thomas, and they did so by making a conveyance, in 1865, to one Edward Davis, who bought the interest of Thomas, Thomas having been advised not to take a conveyance from himself as executor. Nine thousand eight hundred and twenty-five dollars were paid in cash, and the remainder of the purchase

price, $7,175, was secured to be paid by a mortgage upon the
farm. The cash was paid by Davis, Thomas having an
arrangement with Davis by which he was to give a second
mortgage upon the farm for it when Davis should transfer the
title of the property to him. The amount of the mortgage from
Davis to the executors was arrived at by adding together the
$5,000 that was to be invested for the testator's widow, Margaret
Capner, the three legacies of $400 each, which were to be ulti-
mately paid respectively to Frank Hughes, William H. Capner,
and Christianna Capner, and $975, the share of Jane Deegan in
the moneys that were divided at that time, less the $500 that
were bequeathed to her children by her first husband.

The will directed that these moneys should be invested, and
the executors thought that a purchase-money mortgage upon the
homestead farm would be a sufficient investment of them.
Davis afterwards conveyed the farm to Thomas, and Thomas
divided it into three parts and sold the several parts to different
persons. One of these parts, consisting of about forty-six acres,
containing the farm buildings, was sold to Oliver O. Bowman
and two others, who assumed and agreed to pay the mortgage of
$7,175. The executors released the remainder of the farm from
the lien of the mortgage because the development of beds of sand
and clay upon the farm had increased its market value so much
that they concluded that it would be safe to retain their mortgage
upon only forty-six acres of it. Payment of interest upon the
mortgage was continued to October 1st, 1877, and then it ceased.
At that time the collection of interest and the actual management
of the affairs of the estate were in the hands of Joseph Capner,
his brothers James and Thomas having given up active partici-
pation in the management. Upon default in the payment of the
interest, without notice to his co-executors, Joseph commenced
proceedings in this court to foreclose the mortgage, and on
November 17th, 1878, obtained a decree in favor of the execu-
tors for $7,753.98 and costs of the suit. Upon this decree
execution was issued, and such proceedings were had under it
that the lands, upon which the mortgage was a lien, were, on
April 22d, 1879, sold by the sheriff of Mercer county to Joseph

Capner, for $6,055. Joseph paid the sheriff's fees and the costs of the foreclosure, but no other part of the moneys that he had bid for the farm. He then took possession of the land, and repaired and improved the buildings on it. Since the sale to him he has had all the rents, issues and profits of the place. He claims now to own the farm in his own right, in fee, and to be accountable only for the $6,055, that he purchased it for at the sheriff's sale. He produced witnesses who testify that at the time of the sale, in their opinion, the land was worth about $7,000. The property appears to be now worth several thousand dollars more than that sum.

Several witnesses testify that, at various times, Joseph Capner declared that he held the farm in trust for his brothers and sisters. Mary A. Howell, a sister, says that after her mother's death, in July, 1882, Joseph said that the farm was increasing in value, and that if it brought $20,000, his brothers and sisters would all share equally in it with him. Mrs. Howell's son-in-law, William Britton, stated that, in talking about the settlement with Mrs. Howell, Joseph said that he had bought the farm for the benefit of the heirs, and expected to share it with them. Ralph A. Dey, a son-in-law of James Capner, testified that, in 1885, Joseph told him that he held the deed of the farm in trust for the heirs, and that he did not settle with them, because he thought the place would increase in value and thus benefit them all. George Mortimore, who married Margaret Capner, states that, in 1886, Joseph explained that he did not " pay the liens off," because he thought that the property was enhancing in value, and that, if he was correct, they would all reap the benefit. On the 1st of April, 1887, Joseph delivered to his sister, Margaret Mortimore, a writing by which he acknowledged that he, as an executor of his father's will, had purchased the mortgaged farm, and by which he agreed that when the farm should be sold he would divide the proceeds of sale, less expenses, with his said sister, her heirs and assigns, in proportion to her interest in their father's estate.

In 1883, Joseph Capner paid to the complainants William H. Capner and Christianna Clark their legacies of $400 each, in full,

Deegan *v.* Capner.

they having become of age. And after this cause was at issue, and the taking of the proofs nearly concluded, he obtained from Mary Ann Howell, Elizabeth M. Hughes, Margaret Mortimore and James Capner, assignments of their respective interests in the farm and releases of all claims and demands against him individually and by reason of his executorship of his father's will, and at the same time obtained from the administratrix of his brother Hugh Capner a similar release. For these assignments and releases he paid various sums of money, which will average about $820 in the case of each brother or sister.

The bill is filed by Jane Deegan, Samuel J. Lenahan (who holds an assignment of the interest of Thomas Capner in the $5,000, which was invested for the testator's widow), and William Henry Capner, and Christianna Clark and her husband, who claim in right of William J. Capner, deceased. The defendants are Joseph, Thomas, and James Capner, the executors.

Jane Deegan claims that she is entitled to have paid to her, outright, one-ninth of the $5,000 that was to be invested for her mother, with interest from the mother's death, and to have the $975 that was invested for her, re-invested upon bond and mortgage. William H. Capner and Christianna Clark claim that they are together entitled to one-ninth of the $5,000 aforesaid, with interest, and Samuel J. Lenahan claims that he is entitled to the share of Thomas Capner in the said $5,000.

The bill prays that the executors may be required to account with the complainants, and pay them the moneys they claim as aforesaid ; that the moneys due them may be declared to be a lien upon the lands which were conveyed by the sheriff to Joseph Capner as aforesaid ; that Joseph Capner may be decreed to hold the said lands in trust for the estate of Thomas Capner, deceased ; that he may be decreed to sell it and pay the proceeds of sale to the heirs of Thomas Capner, deceased ; that out of the proceeds of sale $975 may be invested on bond and mortgage for Jane Deegan, according to Thomas Capner's will, and that the complainants may have such other relief as may be equitable.

*Mr. James S. Aitkin,* for the complainants.

*Mr. A. V. Schenck,* for the defendant, Joseph Capner.

THE CHANCELLOR.

The object of this suit is, in short, to secure to the estate of Thomas Capner the farm purchased by the executor, Joseph Capner; to obtain an accounting by the executors; to determine the amount of the residue of the estate, and to whom it is to be distributed, and to procure a distribution of it.

The first objection urged is, that all necessary parties to such a suit are not before the court.

No objection is made because those who have receipted and released to Joseph Capner for their shares of the residue have not been made parties, but it is shown that Frank Hughes is dead, and it is insisted that his father, Gideon Hughes, should be a party, as his representative, and also that the children of Jane Deegan, by her first husband, Margaret, Mary, Sarah and Lavinia Lord, should be parties. The testimony shows that Frank Hughes died after he had attained the age of twenty-one years; that he was the illegitimate son of the testator's daughter Sarah; that shortly after his birth, Sarah, and Gideon Hughes, who was the natural father of Frank, intermarried, and that Sarah died in her father's lifetime. Under this state of facts, neither Frank nor his representatives could be interested in the residue of the estate of Thomas Capner after the payment of the legacies. But the legacy of $400 to Frank was due and payable to him at his death, and should go to his executor or administrator. It does not appear that Gideon Hughes acts in either of these capacities. If he does act in either capacity, he should be made a party. It is alleged that the funds, which were set apart for Frank's legacy, have been used by the executors, or one of them, in a private venture, and mixed therein with funds which belong to the residuary legatees or next of kin. The personal representative of Frank should then be made a party, not only to take part in the accounting but also that it may be determined, as between him and the residuary legatees or next of kin, what interest, if any, he has in the profits that were made by the use of the mixed trust funds. Until

such determination is had, the residue for distribution cannot be ascertained. The object of the bill is to obtain a general accounting, followed by distribution. I think that Frank's representative is a necessary party to such a suit.

Margaret, Mary, Sarah and Lavinia Lord stand in a different situation. Their mother claims that, as to the principal of the $5,000 which was invested for Margaret Capner, Thomas Capner died intestate, and that therefore she is now entitled to a portion of it as one of his next of kin, and that the money she may thus take is not to be ultimately divided among her said children. This claim raises the question whether the principal of the $5,000, which was to be set apart for the widow, is included in the residue that is disposed of by the fourth paragraph of the will. If it is included therein, whatever Jane Deegan may take by reason of it must be invested for her and be divided ultimately among her said children. Those children are then interested in the solution of that question, and are entitled to be heard upon it. They are necessary parties, and they must be brought in, not only before it is determined whether their mother shall take as one of the next of kin or under the residuary clause of the will, but also before an accounting by the executors, for, in the event of their mother taking under the residuary clause of the will, they will be directly interested in the amount of the residue. They should also be brought in, in order that they may be bound by the executors' accounting and the decree thereon. To a suit in which the ascertainment and disposition of the residuary estate, is sought, all persons interested in the residue must be made parties. *Story's Eq. Plead.* § *89; Calvert on Parties 171; Reed* v. *Patterson, 17 Stew. Eq. 211.*

In considering the validity of the purchase of the mortgaged farm by Joseph Capner, one of the executors, we are at once confronted by the well-established rule that a trustee shall not be permitted to derive advantage from the administration of property committed to his charge. Here, Joseph Capner became sole acting executor, and, while acting in that capacity, instituted a suit to foreclose a mortgage that he held as executor. He controlled the suit, brought the mortgaged premises to sale, attended

the sale, and bought the property in his own name. He did not bid the full value for the property, and did not either pay the sheriff the amount of his bid, or set that amount apart for the benefit of the estate. He does not pretend that he has ever been ready to pay the purchase-money, but, on the contrary, when applied to for a settlement of the estate, has admitted the use of the mortgage in his purchase, and has urged delay in order that the property purchased may increase in value for the benefit of his *cestuis que trustent*. The facts pertinent to the rule I propose to apply to this transaction are, that he not only bought property of which, as trustee, he caused the sale, but used the trust funds in its purchase. Where such facts appear, the court will not inquire into the fairness of the transaction, nor look for profits to show the intent with which the purchase was made. The *cestuis que trustent* will not be put to the proof of fraud. If trust property has been dealt with by the trustee and a profit has been made, the transaction will, at the instance of a *cestui que trust*, be held to have been entered into for the benefit of the trust. A trustee will not only be deprived of all profit in such a proceeding, but will be obliged to make good any loss that it may occasion the trust.

The law upon this subject grows out of the public policy of elevating the trustee above temptation, and holding him in such a position that to deal honestly with respect to his trust shall not be a strain upon him.

In *Staats* v. *Bergen, 2 C. E. Gr. 554,* it appeared that a trustee invested trust funds in a second mortgage upon a farm, and that subsequently, at a sale in a suit to foreclose the fourth mortgage, to which suit all the holders of the mortgages upon the farm were parties, he bought the mortgaged premises for less than the amount then due upon the first and second mortgages. His *cestui que trust* was personally interested in the third and fourth mortgages. The trustee did not pay the trust moneys, and refused to convey the farm to the *cestui que trust*. The *cestui que trust* filed a bill to compel a conveyance to her upon equitable terms, or to compel a payment of the trust moneys, with interest. In that case, in the court of errors and appeals, Chief-Justice Beasley stated the

Deegan *v.* Capner.

general rule applicable to such sales to be, that, if a trustee or person standing in a similar capacity sell, a trust estate and become himself interested, either directly or indirectly, in the purchase, the *cestui que trust* is entitled as of right to have the property resold, or, at his election, to acquiesce in the sale, and said, that it makes no difference in the application of the rule that the sale was at public auction, *bona fide*, and for a fair price. It is also held, in that case, that, where the trustee is bound in duty to protect his mortgage at a foreclosure sale, and buys the mortgaged premises, he is within this rule.

The case before me is more decidedly within the rule thus stated than *Staats* v. *Bergen*, for here the foreclosure, as has been said, was instituted, conducted and controlled by the trustee, who was bound to protect the mortgage he sought to foreclose, while in *Staats* v. *Bergen* the foreclosure sale was brought about by another mortgagee, and the trustee merely followed in the suit, and attended the sale to protect the trust mortgage.

In that case the chief-justice further says: "There is also another ground of objection to this claim of the defendant. The purchase was made by the use of the mortgage, which was, in equity, owned by the complainant. That mortgage the defendant could not lawfully use in his own concerns, so as to make a profit to himself. If a trustee use trust funds in the purchase of property or in the transaction of business, it is a violation of his duties as trustee, and the profits of such purchase or business must enure to the benefit of the *cestui que trust*."

In *Lewin on Trusts 289*, it is said: "If trust money be laid out by a trustee in buying and selling land, and a profit be made by the transaction, that shall go, not to the trustee who has so applied the money, but to the *cestui que trust* whose money has been applied. So, where a trustee or executor has used the fund committed to his care in stock speculations, though any loss may fall exclusively upon himself, he must account to the trust estate for every farthing of profit. If he lay out the trust money in a commercial adventure, as in buying and fitting out a vessel for a voyage, or put it in the trade of another person from which he is to derive certain stipulated gains, or if he employ it himself, for

the purposes of his own business, in all these cases he must account to the *cestui que trust* for the profits."

In *Perry on Trusts* § *209*, this accountability is said to extend to all bonuses and gratuities that may be given to a trustee by strangers, for contracts made with them in relation to the trust property.

The purchase by Joseph Capner was effected by the use of the trust mortgage. He states that at the sheriff's sale some other person bid $6,050 for the farm, and that but for his bid of an additional $5, that person would have become the owner of the farm. In this situation it is manifest that it was necessary for him to use $6,055 to secure the farm. He frankly admits that, beyond the payment of the costs of foreclosure and the sheriff's fees, he paid nothing for the farm, yet had credited upon the execution in the sheriff's hands, $6,055. Clearly, then, he effected this purchase mainly with the trust funds. I have no hesitation in deciding both upon the ground that he used the trust moneys in effecting that purchase, and upon the ground that he purchased at the sale he conducted as trustee, that the farm must be held to belong to the trust and be sold for its benefit. Its rents, issues and profits must also be accounted for, with interest. Credit will be allowed for the costs and sheriff's fees paid, and also for whatever has been paid for necessary repairs and proper and permanent improvements and taxes, with interest.

The solution of the remaining question in this case, namely, whether at the death of the testator's widow the principal of the $5,000 went into the residue disposed of by the will, or whether, as to that $5,000, Thomas Capner died intestate, will be reserved until all the parties entitled to be heard upon it shall be before the court.

An accounting by the executors, including an accounting for the rents, issues and profits from, and the expenditures upon, the farm will be then decreed. Upon the coming in of the Master's report upon the accounting, the liabilities of the several executors will be determined, and the parties to the suit will be heard upon the construction of the will.